

SAMIDH GUHA
212-399-8350 PHONE
sguha@perryguha.com EMAIL

November 15, 2022

**VIA ECF**

The Honorable Gregory H. Woods
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Warren Michael Wilder*, 20 Cr. 543 (GHW)
                **Sentencing Submission**

Dear Judge Woods:

      We write on behalf of our client, Warren Michael Wilder, in anticipation of his sentencing in the above-captioned matter, scheduled for November 29, 2022, at 10:00 a.m. The parties have an understanding that the applicable Guidelines range is 46 to 57 months and we respectfully submit that Mr. Wilder be sentenced to a period of incarceration within this range. We would ask, however, that Mr. Wilder be permitted to serve the remainder of his sentence on home incarceration to provide much needed support for his young son who is currently in foster care. We believe that such a sentence would be just, appropriate, and consistent with 18 U.S.C. § 3553, for the reasons set forth below.

      Independent of Your Honor's ultimate determination, Mr. Wilder presents himself to this Court for sentencing with great remorse. He prides himself as a community elder, as the many the letters of support to this submission affirm. Unfortunately, his life has been derailed by his own wrongdoing in the past, the most recent involving his decisions to unlawfully possess firearms. In this case, his retention of a firearm was illegal and his transfer of the gun to Mr. Morgan marked the height of irresponsibility, with tragic consequences. It was also close in time to a separate arrest on New York state charges related to his possession of a firearm. In both instances, Mr. Wilder has taken responsibility for his misconduct. It should not have taken these arrests for him to appreciate the terrible error in his ways, but Mr. Wilder's ensuing incarceration and separation from his son has made that clear to him. Attached to this submission is a letter from Tonia Rutherford, the caseworker responsible for W█████'s care in Mr. Wilder's absence. Her letter is especially poignant and describes W█████'s suffering. Mr. Wilder hopes to close this chapter of his life and focus on a lawful and productive path, refocused on being a caring and attentive father to his adolescent child.

1740 Broadway, 15th Floor, New York, NY 10019
212-399-8330 PHONE | 212-399-8331 FAX | www.perryguha.com WEBSITE

The Honorable Gregory H. Woods
November 15, 2022

## Brief Background

Mr. Wilder is a fifty-eight-year-old[1] male and native New Yorker. Mr. Wilder's personal history is unfortunately defined by several periods of incarceration beginning at the age of seventeen. From approximately 2014 to 2020, Mr. Wilder was at liberty and residing with family as a member of the community.

During this time, Mr. Wilder lived in Bronx, New York with his son, W███████████ PSR at ¶ 64. Mr. Wilder maintained sole custody and provided full-time care for his son, who ███████████████████████████████████. His nephew Tayvon Lawrence also lived with Mr. Wilder and his son at that apartment, an invitation Mr. Wilder provided to Tayvon to give him more stability.

Just prior to the events underlying this criminal information, Mr. Wilder was arrested while with another nephew, Shawn Nixon, and both were charged in New York State for criminal violations related to his possession of a firearm. PSR at ¶ 50. Mr. Wilder is separately represented in that matter and pled guilty on August 11, 2022 to a violation of New York State Penal law 110/265.03 for his attempted possession of a loaded weapon, Mr. Wilder is scheduled to be sentenced on that case on November 29, 2022.[2]

## The Instant Offense

On August 31, 2020, shortly before 3:00 p.m., Mr. Wilder was in his apartment speaking on the telephone with a friend. At that time, Mr. Wilder's co-defendant Wayne J. Morgan knocked aggressively on Mr. Wilder's apartment door several times before Mr. Wilder opened the door. PSR at ¶ 10. Mr. Wilder knew Mr. Morgan as a friend of Mr. Wilder's nephew, Tayvon Lawrence. The evening before, Mr. Morgan and Tayvon recorded a music video, in which the two men featured a firearm that was given to Mr. Wilder afterwards. It was unlawful for Mr. Wilder to possess the firearm because of his prior felony conviction.

After the door was opened, Mr. Morgan entered the apartment and remained there for only a few moments before leaving the apartment building. *Id.* During that time, Mr. Morgan told Mr. Wilder to get his nephew Tayvon and also asked Mr. Wilder to provide him with the firearm from the prior evening. Mr. Wilder inexcusably did so.

As Mr. Morgan left the apartment, Mr. Wilder also headed outside the building and focused on bringing his nephew Tayvon back into the apartment from the sidewalk. PSR at ¶ 11. After Mr. Wilder initially approached his nephew in the courtyard, Mr. Wilder was "startl[ed]," as Mr. Morgan began shooting and chasing one of victims. *See* Morgan Sentencing Transcript at 15, lines 19-25. Mr. Wilder takes a step back, with his body sheltered behind the gate of the apartment building, and his nephew was struck shortly thereafter by gunfire from Mr. Morgan. His nephew

---

[1] The PSR incorrectly states that Mr. Wilder is fifty-seven years old. Mr. Wilder's date of birth is April 7, 1964.
[2] Mr. Wilder's state counsel has advised that he will seek an adjournment of that sentencing given that Mr. Wilder's sentencing before Your Honor is schedule for the same date.

The Honorable Gregory H. Woods
November 15, 2022

was hit in the chest and collapsed onto the sidewalk. PSR at ¶ 10. Mr. Wilder walked back into his apartment to retrieve his phone and dialed emergency services himself. *Id.* at ¶ 12. He also called his friend with whom he had been speaking at the time when Mr. Morgan knocked on the door and asked her to also contact the police department, which she did. Mr. Morgan then stayed with his nephew until the police and paramedics arrived. Mr. Wilder watched over his nephew and accompanied him to the hospital. After Tayvon's release from the hospital, Mr. Wilder invited him to stay and recuperate in Mr. Wilder's apartment. It is Mr. Wilder's understanding that after his incarceration, Tayvon moved to Alabama.

On or about September 16, 2020, Mr. Wilder was approached at his apartment by a Detective with the New York Police Department. Mr. Wilder voluntarily answered the inquiries from the officer, providing him with information he had learned after the shooting from various people in the community, but he did not tell them the truth about having provided Mr. Morgan with the firearm. The officer did not arrest Mr. Wilder at that time.

On January 13, 2021, Mr. Wilder was arrested in his home on federal charges of violating Title 18, United States Code, Section 922(g). He was detained pending trial at Metropolitan Detention Center, Brooklyn ("MDC Brooklyn"). Mr. Wilder was initially represented by an attorney pursuant to the Criminal Justice Act ("CJA") but his family collected funds to retain private counsel. His prior private counsel met with Mr. Wilder on only one occasion and then withdrew without returning the funds provided to them by Mr. Wilder's family. Our firm was appointed on or about November 8, 2021 to replace the withdrawing counsel, pursuant to our service on the CJA panel.

Mr. Wilder was scheduled for trial before Your Honor on February 22, 2022. Upon speaking with the government and Mr. Wilder, it became apparent that prior counsel had neglected to advise Mr. Wilder of a plea offer from the government, which we promptly did. On January 27, 2022, Mr. Wilder waived his right to prosecution by indictment and consented to proceeding by information instead. On January 27, 2022, Mr. Wilder pleaded guilty to one count of felon in possession of a firearm under 18 U.S.C. §§ 922(g), 924(a)(2), and 2.

**Calculation of the Guidelines Range**

In advance of sentencing, the government initially sought an enhancement U.S.S.G. § 2A2.1(a)(1), contending that Mr. Wilder should face an additional sanction for the attempted first-degree murder of the two victims of Mr. Morgan's shooting. We respectfully disagreed with the government based on our review of the evidence and our conversations with Mr. Wilder.

Mr. Wilder participated in an interview with the Probation Office on March 10, 2022, in connection with his sentencing. *See* PSR at ¶ 53. The Probation Office adopted the government's view on the applicability of the attempted first-degree murder enhancement. In doing so, the Probation Department calculated Mr. Wilder's Sentencing Guidelines range, determining that Mr. Wilder was subject to a total offense level of 34 and falls within Criminal History Category III. The Probation Office, without objection from the government, granted Mr. Wilder a three-point reduction for acceptance of responsibility pursuant to USSG §3E1.1(a) and (b). *Id.* at ¶¶ 39-40. Accordingly, the Probation Department identified the Guidelines range for Mr. Wilder to be 188

The Honorable Gregory H. Woods
November 15, 2022

to 235 months imprisonment and a potential fine between $35,000 and $250,000. *Id.* at ¶¶ 85, 93. However, pursuant to USSG § 5G1.1(a), the statutory maximum term of imprisonment for this offense is 120 months, which is lower than the minimum applicable Guideline range. As such, the Probation Office determined that Mr. Wilder's Guideline term of imprisonment is 120 months. *Id.* at ¶ 85.

We objected on Mr. Wilder's behalf to the application of the attempted first-degree murder enhancement. The government also sought the attempted first-degree murder enhancement against Mr. Morgan, who discharged the weapon and shot the victims. Your Honor scheduled a *Fatico* hearing for both defendants which was postponed due to COVID-19 on two occasions.

During the period between Mr. Wilder's guilty plea and the scheduled *Fatico* hearing, we maintained a regular dialogue with the government, advocating against the application of the attempted first-degree murder enhancement. We greatly appreciate the government's willingness to engage with us and listen to our assessment of the evidence and representations about our client's lack of intent. On or about October 4, 2022, the government advised us that it would agree that the reduced enhancement relating to serious bodily injury – and not attempted first degree murder – applied and as a result, it would agree that the appropriate Sentencing Guideline is 46 to 57 months. The government advised Your Honor that as a result of this agreement, Mr. Wilder would no longer need a *Fatico* hearing.

In sum, the government and Mr. Wilder understood that the following sentencing guidelines calculation would be appropriate:

1. The cross reference in U.S.S.G. § 2K2.1(c)(1)(A) applies because the defendant possessed and transferred the firearm in connection with the commission or attempted commission of an aggravated assault, and because the resulting offense level pursuant to U.S.S.G. § 2A2.2 (aggravated assault), is greater than the offense level pursuant to U.S.S.G. § 2K2.1(a)-(b).

2. Under U.S.S.G. § 2A2.2(a), the base offense level is 14.

3. Under U.S.S.G. § 2A2.2(b)(2)(A), five levels are added, because a firearm was discharged.

4. Under U.S.S.G. § 2A2.2(b)(3)(B), five levels are added because a victim sustained serious bodily injury, as defined in U.S.S.G. § 1B1.1 Application Note 1(M).

5. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1.(b), because the defendant gave timely notice of his intention to enter a plea of guilty,

The Honorable Gregory H. Woods
November 15, 2022

    thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

6. In accordance with the foregoing calculations, the applicable offense level is 21.

7. The defendant's Criminal History Category is III.

Based upon the calculations set forth above, the parties agreed that Mr. Wilder's Guidelines range is 46 to 57 months' imprisonment.

### Disagreement Regarding the Applicable Subsection of U.S.S.G. § 2A2.2

In preparing for Mr. Wilder's sentencing, we realized for the first time that while the parties agreed on the applicable Sentencing Guidelines calculation and the resulting range of 46 to 57 months, the parties did not in fact agree on which subsection of the enhancement under U.S.S.G. § 2A2.2 for aggravated assault applies. On November 2, 2022, we wrote to the Court that a sentencing agreement between the parties was not finalized due to this disagreement as to the applicable subsection. *See* ECF No. 121.

The Application Notes provide four definitions for aggravated assault:

> 'Aggravated assault' means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony.

U.S.S.G. §2A2.2 Application Notes, Definitions. The parties in their good faith discussions agreed to the application of the provision but, as we now understand, did not agree whether subsection (A) or subsection (B) applied to Mr. Wilder's conduct. Mr. Wilder contends that subsection (B) applies, which recognizes the serious bodily injury caused by Mr. Morgan's discharge of the firearm provided admittedly and regrettably by Mr. Wilder. The government, however, contends that subsection (A) is the applicable subsection, which would ascribe to Mr. Wilder an intent in providing the firearm to Mr. Morgan which Mr. Wilder disputes.

This disagreement between the parties does not impact the understanding as to the applicable Sentencing Guidelines range. As such, we believe that Mr. Wilder's base offense level is 21 and he is in Criminal History Category III, yielding a Guidelines range of 46 to 57 months.

On November 3, 2022, we wrote to Probation informing them of our filing of ECF No. 121 and the mutual agreement with the government as to the application of U.S.S.G. § 2A2.2 and the need to adjust the PSR. During this endeavor, we were informed that Mr. Wilder's prior probation officer, Sandra Campbell, no longer worked for Probation, and Mr. Wilder was not assigned a new probation officer yet. On November 14, 2022, a new Probation officer was assigned to the matter

The Honorable Gregory H. Woods
November 15, 2022

and we have provided information to the Officer regarding the application of the aggravated assault enhancement and the impact on the applicable Guidelines range for Mr. Wilder.[3]

# ARGUMENT

## I. THE § 3553(A) FACTORS SUPPORT A SENTENCE WITHIN THE GUIDELINES RANGE FOR MR. WILDER

### A. Legal Standard

It is a fundamental principle of sentencing that a court "shall impose a sentence sufficient, but not greater than necessary" to meet the goals of sentencing. 18 U.S.C. § 3553(a). Among the factors that the court must consider in determining an appropriate sentence is the defendant's Sentencing Guidelines range. 18 U.S.C. § 3553(a)(4). In sentencing a defendant, a district court must "begin [its] analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). However, a sentencing court "may not presume that the Guidelines range is reasonable." *Id.* at 50. As the Court is well aware, "the Guidelines are guidelines—that is, they are truly advisory," and hence this Court is "generally free to impose sentences outside the recommended range." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).

The system "requires a court to give respectful consideration to the Guidelines," but it "permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (*quoting United States v. Booker*, 543 U.S. 220, 245-46 (2005)). "Although the Guidelines remain 'the starting point and the initial benchmark' for sentencing, a sentencing court may no longer rely exclusively on the Guidelines range; rather, the court 'must make an individualized assessment based on the facts presented' and the other statutory factors." *Beckles v. United States*, 137 S.Ct. 886, 894 (2017) (*quoting Gall*, 552 U.S. at 49-50) (internal citation omitted). "The Guidelines thus continue to guide district courts in exercising their discretion by serving as 'the framework for sentencing,' but they 'do not constrain th[at] discretion.'" *Id.* (*quoting Peugh v. United States*, 133 S.Ct. 2072, 2083 (2013)).

In exercising discretion, "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *Cavera*, 550 F.3d at 188; *see also Gall*, 552 U.S. at 51 (explaining that a sentence outside the Guidelines carries no "presumption of unreasonableness" and the "Guidelines are only one of the factors to consider when imposing sentence"). Under this framework, "[i]n addition to taking into account the Guidelines range, the district court must form its own view of the 'nature and circumstances of the offense and the history and characteristics of the defendant.'" *Cavera*, 550 F.3d at 188 (citing 18 U.S.C. § 3553(a)(1)). A district court "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *Id.* at 189 (footnote omitted). In considering the § 3553(a) factors, sentencing courts should give no greater weight to the Guidelines calculation than any of the other factors. *See Kimbrough*, 552 U.S. at 101; *see also*

---

[3] The Probation Office has advised that it is prepared to produce a revised Pre-Sentence Report should Your Honor order it to do so in advance of Mr. Wilder's sentencing.

*Simon v. United States*, 361 F. Supp. 2d 35, 40 (S.D.N.Y. 2005). Indeed, the Court must "consider all of the § 3553(a) factors." *Gall,* 522 U.S. at 49-50.

Under 18 U.S.C. § 3553(a), the Court must consider, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the need for just punishment, adequate deterrence, and protection of the public; (3) the "kinds of sentences available"; (4) the applicable Sentencing Guidelines range; (5) the need to "avoid unwarranted sentence disparities"; and (6) the need for restitution. *See* 18 U.S.C. § 3553(a). These § 3553(a) factors support the conclusion that a sentence of time served in this case is a just sentence.

### B. The Nature and Circumstances of Mr. Wilder's Offense

As officers of the Court and having discussed this matter carefully with Mr. Wilder, we must acknowledge that the nature and circumstances of Mr. Wilder's offense warrant a sentence of incarceration. We, along with Mr. Wilder, acknowledge this rather than reflexively seeking a sentence of time served or something similar. Mr. Wilder's repeated possession of firearms, in violation of his legal prohibition of doing so, cannot be overlooked, or minimized and he is taking responsibility for his misconduct. Especially given the pandemic of gun violence that plagues the city and nation, Mr. Wilder cannot be excused for his willingness to keep and share firearms, especially given his age and life experience. While he cannot offer justifications for his past, his immediate incarceration has served as a reminder that his time, especially given his health conditions described below, is short and he must focus on pursuing a positive, lawful life upon release.

The circumstances around the offense conduct here are admittedly worthy of harsh but measured judgment. Mr. Wilder provided the firearm thoughtlessly, as indicated by the brevity of their interaction at his apartment, but very consciously. Simply put, Mr. Wilder could have -- and most certainly should have -- said no to Mr. Morgan's request and he failed to do so. And, as Your Honor noted in the sentencing of Mr. Morgan, the string of victims stretches beyond the two individuals shot and seriously injured but also to the bystanders and spectators, including young children. Mr. Wilder is certainly responsible for facilitating the introduction of a gun into the neighborhood routine. Moreover, Mr. Wilder did not respond honestly about his role when questioned by the New York City detective. Though not charged for this conduct, Mr. Wilder acknowledges his wrongdoing and apologizes for it.

On the other hand, Mr. Wilder should not bear full responsibility for Mr. Morgan's decision to discharge the firearm. Mr. Wilder is responsible for the injuries that ensued because of his recklessness in providing Mr. Morgan with the firearm. This sanction is captured by the application of the aggravated assault enhancement, specifically subsection (b). We submit that the punishment should be moderated because there is no evidence that Mr. Wilder had the intent that Mr. Morgan would shoot the weapon as he did, and, indeed, the proof instead supports Mr. Wilder's lack of any such state of mind.

*First*, the brevity of the interaction between Mr. Morgan and Mr. Wilder is indicative of the lack of information Mr. Wilder had of Mr. Morgan's intention with the firearm. On the day of the shooting, there were no indications that the day would end in violence or bloodshed. Mr. Wilder

The Honorable Gregory H. Woods
November 15, 2022

had spent the day mostly inside his apartment with his thirteen-year-old son. Before Mr. Morgan appeared, Mr. Wilder had spent the afternoon on the phone with his close friend, Lajan Hammond. *See* Ex. B.[4] When Mr. Morgan knocked, Mr. Wilder was still on the phone. In fact, Mr. Morgan knocked several times before Mr. Wilder opened the door. Mr. Morgan was in Mr. Wilder's apartment for approximately one minute.

*Second*, Mr. Wilder's reactions as Mr. Morgan discharged the weapon in the courtyard reflect his surprise. As Your Honor noted in your careful analysis of the video evidence at Mr. Morgan's sentencing, Mr. Wilder was "startl[ed]" just before his nephew was shot and as the other victim fled from Mr. Morgan. Despite the absence of audio, it is a fair assumption from the context that Mr. Wilder was reacting to the shooting of the firearm which was unexpected to him. It also caused him to accelerate his efforts to get his nephew into the building. Mr. Wilder was focused on keeping his nephew out of trouble and altercations, which prompted him to come out to the courtyard in the first place, but he did not expect this turn of events.

*Third*, Mr. Wilder's recorded statements post-shooting indicate his lack of knowledge of Mr. Morgan's intentions to harm anyone. On September 1, 2020, in a recorded phone call, Mr. Wilder made the following statement to Mr. Morgan regarding the firearm exchange: "My joints [fingerprints] is on them shits…Yeah, my prints is on them shits. 'Cause I didn't -- you didn't give me no time. I just randomly threw them in there for you." Ex. C, GX 7-T at 1-2. The most logical interpretation of this statement calls into question the idea that Mr. Wilder had the requisite intent in providing the firearm to Mr. Morgan. If Mr. Wilder knew that Mr. Morgan intended to shoot anyone, Mr. Wilder says on this recording that he would have acted differently. He would have tried to avoid being linked to the shooting by wiping any fingerprints off before handing the weapon to Mr. Morgan. He did not do so because he did not realize that Mr. Morgan intended to discharge the weapon.

*Fourth*, as noted above, Mr. Wilder's nephew, Tayvon Lawrence, was a victim of the shooting and seriously injured by Mr. Morgan's conduct. Mr. Wilder cared for Mr. Lawrence as a son. Mr. Lawrence had lived with Mr. Wilder for approximately two and half years at the time of the shooting. Mr. Martin came to live with Mr. Wilder when he was around 20 years old at the request of his mother, Mr. Wilder's sister, because she was concerned about Mr. Lawrence's wellbeing and ability to stay out of trouble. Mr. Lawrence, prior to moving in with Mr. Wilder, often got in trouble at school and had difficulties with law enforcement. As such, Mr. Wilder not only provided housing for Mr. Lawrence but also provided him with guidance and tried his best to keep Mr. Lawrence out of trouble and guide him in the right direction to become an employed, productive member of society. Mr. Lawrence was known to be a "hot head" and often Mr. Wilder would be called over to calm down Mr. Lawrence and remove him from an escalating social situation.

In addition, Mr. Wilder knew and was friendly with Victim-1 and his family. Mr. Wilder often played chess, bingo, and poker with Victim-1's father. Mr. Wilder never wished harm to

---

[4] In Ex. B, we have highlighted for ease of reference the calls between Mr. Wilder and his friend on the day of the shooting. Mr. Wilder's number in the call log is 347-290-2690 and his friend's number is 516-309-8400.

8

The Honorable Gregory H. Woods
November 15, 2022

befall Victim-1 and would not have provided the firearm to Mr. Morgan if he knew Mr. Morgan had intended to shoot Victim-1.

Mr. Lawrence independently emailed this Court on April 19, 2021 advocating to the Court directly and personally that Mr. Wilder had no knowledge of Mr. Morgan's intentions to shoot anyone. *See* ECF No. 41. In that email, Mr. Lawrence told the Court that Mr. Wilder "had nothing to do with it [.] we didn't know that guy was just gonna start shooting [.] I was an innocent bystander [.] the guy didn't even mean to shoot me [.] my uncle has always been there for me when no one was [.] in out here by myself [.] ya took him from ppl that loves him so much including me for something [.] […] I'm in the same place where I got shot and never heard anything about my uncle having something do with it [.] and this is soo wrong man [.] he is more of a father to me then my own father [.] he got me in school [,] got me working[,] never stirred me in the wrong direction [.]" ECF No. 41.

While we remain appreciative of the government's willingness to engage in a fair dialogue with us and agree as to the appropriate Guidelines range, we disagree that the subsection for the aggravated assault which holds Mr. Wilder accountable for having intent is applicable. Under these circumstances, Mr. Wilder, as the non-shooter, had no agency over Mr. Morgan's decisions after Mr. Wilder provided him with the firearm. Mr. Wilder had no control over whether or not Mr. Morgan fired the gun. Mr. Wilder had no control over the range at which Mr. Morgan fired or Mr. Morgan's aim, or the number of shots Mr. Morgan fired. These are all of course relevant in measuring Mr. Morgan's intent, as Your Honor noted at Mr. Morgan's sentencing, but not applicable to Mr. Wilder. *See* Morgan Sentencing Transcript at 14-20.

### C.  Mr. Wilder's Personal History and Characteristics

The inquiry under Section 3553 does not stop with consideration of the offense conduct, as the Court is well aware, but instead seeks a holistic understanding of Mr. Wilder taking account of the other acts. The defendant's history is an important data point in considering the "elementary principle of weighing the good with the bad" and putting the "immediate misconduct . . . in the context of [the defendant's] overall life hitherto," at the "moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006). Mr. Wilder's background and his character provide a counter-balance to the offense conduct in favor of a downward variance from the Guidelines range.

The best way to understand who Warren Wilder is, is through the letters of support submitted by those who know him best. Several family, friends, and community members have written impassioned letters of support, illustrating how Mr. Wilder has grown as a person and become a pillar of his community. He is a loving and dedicated family man, who has acted with generosity and kindness that has bettered the lives of others.

To speak to his character, we have enclosed this this sentencing submission letters of support from friends, family, and neighbors who were more than happy to write about Mr. Wilder. *See* Ex. D. A constant across the letters submitted is Mr. Wilder's dedication to his community. Gladys Rivera writes that Mr. Wilder is known as "the big uncle in the community because he always steps up to that part by stopping kids from getting in trouble and trying to find them a

9

positive route to go on so that they can remain good kids and not be [s]wept by the influence of the streets." Ex. D, Ltr. 6. Shana Curtis describes him as "loving and caring with his kids and other people's kids." *Id.*, Ltr. 2. Lajan Hammond writes that Mr. Wilder is "always there for his kids and his community, especially the elderly." *Id.*, Ltr. 4. Dawn Tartt shared how Mr. Wilder "helped in caring for my 84-year-old mother and with his support has helped me to keep her home and not in a nursing home facility." *Id.*, Ltr. 7. Gladys Rivera, an elderly woman herself, describes how Mr. Wilder, "helping me carry my bags up 5 flights of stairs when my elevator was broke. He even offered to go to the stores for me so I don't have to go up and down the stairs." *Id.*, Ltr. 6

Mr. Wilder is "community minded and other centered." *Id.*, Ltr. 7. He is beloved for his regular cookouts and backyard functions, which bring together everyone, from the homeless to the elderly and youth, to celebrate and strengthen their ties to one another. Lajan Hammond writes that he "always reliable no matter what he's doing or got going on in his everyday life." *Id.*, Ltr. 4. Mr. Wilder's altruism and community-mindedness hasn't wavered, even throughout his time incarcerated. MDC staff has praised Mr. Wilder in his performance reviews, describing him as an "outstanding orderly… who goes above and beyond to ensure the unit is staying fit." Ex. E. He is known for being a "dependable, timely, and […] positive" worker, who always assists other inmates in their duties on top of his own. *Id.* Two letter writers offered Mr. Wilder employment upon his release. Dawn Tartt praised Mr. Wilder for his timeliness, respectfulness, and that he "would put forth every effort to provide exceptional customer service to our customer and clients." *Id.*, Ltr. 7. She goes on to offer Mr. Wilder a position at her cleaning service company. Elizabeth Brabham believes Mr. Wilder would be "a great asset to [her] organization," a nonprofit that provides "furnish[ed] meals, build[es] character, and uplift[s] spirits." In Bronx communities *Id.*, Ltr. 1.

Mr. Wilder's dedication to his community and industriousness is only surpassed by his love and commitment to his family. Lajan Hammond writes how Mr. Wilder is a "big part of his kid's life." As described in the Presentence Investigation Report, Mr. Wilder "shares a good relationship with his younger children, who have visited with him during the weekends prior to his arrest for the instant offense." PSR at ¶ 63. Shana Curtis shared that "being around him and his deal with them [Mr. Wilder's children] they were his pride and joy." Ex. D, Ltr. 2. Mr. Wilder is a "man of family" as Alyssia Darvilus describes. *Id.*, Ltr. 3. He is"[a]lways there for everyone else." *Id.*, Ltr. 3. Alyssia writes that Mr. Wilder helped out greatly when she was younger and that "he was like a second father to me and my sister." *Id.*, Ltr. 3. Gaelle Mentor writes that Mr. Wilder was there "whenever we needed help. He would never hesitate. He was a great father! He took great care of his kids and they love him very much." *Id.*, Ltr. 5 He has stayed in regular contact with his younger children since he was incarcerated, though the pandemic has severely impacted his ability to maintain his connection to them. Despite this, Mr. Wilder consistently makes an effort to keep in touch.

Mr. Wilder deeply and sincerely regrets his actions of maintaining a firearm in his home and giving it to Mr. Morgan. He understands firsthand the harmful impact that firearms have on the community. Mr. Wilder was struck by a stray bullet in his leg in 2005 that has left him permanently injured. *See* PSR ¶ 67. Mr. Wilder underwent several rounds of reconstructive surgery on his leg which has left his leg scarred and disfigured. Over seventeen years later, Mr. Wilder still walks with a limp and a cane due to this injury. In 2009, Mr. Wilder's son, Sir'Mone, a U.S. Army

10

veteran, committed suicide with a firearm. *See* PSR ¶ 61. Against this backdrop, it is remarkable that Mr. Wilder did not appreciate the folly of the gun culture in which he has been enmeshed; this arrest and period of incarceration has certainly driven that point home.

While incarcerated, Mr. Wilder has taken advantage of every opportunity to better himself and those around him. In 1991, Mr. Wilder received his General Equivalency Diploma ("GED") from New York State, and, in 1992, went on to attend Mercy College while at Attica Correctional Facility. Mr. Wilder has taken courses in culinary arts and psychology. Ex. E. At MDC Brooklyn, Mr. Wilder's current carceral facility, Mr. Wilder has exhibited exemplary behavior and has no reported negative interactions with staff or other inmates. PSR at ¶ 6. Mr. Wilder has also received certificates from MDC for completing programs relating to nutrition, exercise, and mental well-being. Ex. E.

### D. Mr. Wilder's Son Needs Mr. Wilder in His Life as Soon as Possible

The singular focus for Mr. Wilder since our very first conversation with him as counsel has been the well-being of his ▮▮▮▮, W▮▮▮▮ Mr. Wilder had sole custody of W▮▮▮ before his arrest and incarceration. Taking care of W▮▮▮ was a full-time responsibility. ▮▮▮▮ PSR ¶ 62. As Ms. Hammond notes in her letter, ▮▮▮▮ *See* Ex. D, Ltr. 4. Mr. Wilder intends on regaining custody upon release, *see* PSR ¶ 64, and has been working closely with W▮▮▮ foster case worker, Tonia Rutherford, including by signing off and consulting with her on ▮▮▮▮. Despite his incarceration, Mr. Wilder has consistently appeared at family court proceedings related to ▮▮▮ and is as involved as possible in aiding the case worker with managing ▮▮▮ welfare and schooling.

Ms. Rutherford has written a letter to the Court detailing her professional opinion on the custody situation in the best interest of the child. Ex. F. In her letter, Ms. Rutherford explains the difficult and extra ordinary situation that W▮▮▮ faces. He is a child with ▮▮▮▮
▮▮▮▮ Ex. F at 1. W▮▮▮
▮▮▮▮ since Mr. Wilder has been incarcerated. *Id.*
▮▮▮▮

As Ms. Rutherford notes, Mr. Wilder's incarceration has had a "serious impact" on ▮▮▮ who has never had "Mr. Wilder…out of his life this long." *Id.* at 2. No one in W▮▮▮ life knows how to handle W▮▮▮ ▮▮▮ and cares for him like his father. Ms. Rutherford provides the clearest example of this in her letter, when she describes a visit to MDC Brooklyn with ▮▮▮. At that visit, ▮▮▮▮

11

███

Having Mr. Wilder united with ███ as soon as possible would be in the best interest for the community and W███ as Mr. Wilder has ███ that no one else does. Even the Warden at MDC Brooklyn acknowledged as much, as Ms. Rutherford notes in her letter: "During the visit, the prison warden came down to speak with ███ expressing his concern over W███ earlier behavior and informing me that W███ can come to visit his father anytime with a phone call directly to him." Ex. F at 3. Prior to Mr. Wilder's incarceration, he provided full-time care to W███ Due to the degree of W███

███ When Mr. Wilder was arrested in January 2021, ███

Mr. Wilder worries incessantly about W███ well-being. Mr. Wilder has been intensely focused in each of his discussions with us over the past year on W███ and the impact that Mr. Wilder's potential sentence may have on his ability to provide care for W███ The stakes have increased, as Ms. Rutherford notes that W███ is ███ *Id.* at 1. Mr. Wilder is committed to resume care of ███ when able to do so in order to increase the chances that W███ will live a safe, supported, fulfilling life.

The sentence Mr. Wilder receives will impact his parental rights and ability to care for W███ Ms. Rutherford has expressed that if Mr. Wilder was released by 2024, it is less likely that Mr. Wilder's custody rights for W███ would be terminated. In her letter, Ms. Rutherford voices her support for Mr. Wilder to receive as short a sentence as possible and her hope that Mr. Wilder receive home confinement as a sentence for W███ benefit. Having Mr. Wilder in W███ life is important and necessary to W███ development and betterment. However, an elongated sentence would likely end in the termination of Mr. Wilder's parental rights and years of uncertainty and hardship for W███ as he navigates the foster care system and continues to ███. While no doubt this reality is one that Mr. Wilder should have considered before possessing firearms and exposing himself to this risk, he is acutely aware of his responsibility for the situation facing his son and determined to make amends.

---

[5] *See* In the matter of W███ Bronx Family Court, Docket No. NN-01099-21.

### E. Mr. Wilder has Multiple Pre-Existing Health Conditions that Place Him at Risk of Severe Illness or Death While Incarcerated.

The Court is well aware of the challenging circumstances facing those prisoners incarcerated during the pandemic. Mr. Wilder was arrested on January 12, 2021 and has been incarcerated since that time. He, like so many others in the prison system including both staff and prisoners, have suffered in an outsized manner because of the public health challenges. During his incarceration, which pre-dated widespread vaccine availability, Mr. Wilder has lived with the fear of contracting the coronavirus, which threatened to exacerbate his other health conditions.

Mr. Wilder suffers from ongoing ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *See* PSR ¶ 66. He previously was also treated for lung cancer. Mr. Wilder sustained a long-term injury from a stray bullet wound in 2005 that left his leg scarred and disfigured. *See* PSR ¶ 67. To date, Mr. Wilder still walks with a cane and has a limp from this injury.

Three of Mr. Wilder's ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ increase both the risk of Mr. Wilder contracting a severe case of COVID-19 and the threat that such infection would post on his life. On its website, the Centers for Disease Control and Prevention (CDC) lists numerous conditions that make a person "more likely to get very sick from COVID-19", meaning they are more likely to be hospitalized, need intensive care, require a ventilator, or die[6]. COVID is still considered a public health emergency as of October 14, 2022 and many experts believe that another surge is coming this winter.

Among the conditions listed are "Chronic Lung Diseases," which includes ▬▬▬▬ Mr. Wilder ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *See* Ex. G. The CDC also lists high blood pressure (hypertension) as a "Heart Condition" that it considers increasing the likelihood that someone gets very sick from COIVD-19, and lists "Diabetes (type 1 or 2)" as another risk factor. Separately, these each illness each illnesses increase Mr. Wilder's risk of contracting a severe case of COVID-19. Together, they compound to create serious health complications if Mr. Wilder does contract COVID-19.COVID cases are on the rise, with neighborhoods in Manhattan seeing a positive rate of more than 20% as of October 19, 2022.[7] As of October 21, 2022, the CDC classified most of New York State as having medium or high rates

---

[6] *People with Certain Medical Conditions*, Centers for Disease and Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[7] *Covid Rates Back Above 20% in Parts of Manhattan as Virus Rebounds,* NBC New York, https://www.nbcnewyork.com/news/coronavirus/covid-rates-back-above-20-in-parts-of-manhattan-as-virus-rebounds/3913772/.

of COVID.[8] Levels are expected to rise as winter approaches and the nation is faced with new variants of COVID, the flu, and respiratory syncytial virus.[9]

Moreover, Mr. Wilder like other prisoners during the pandemic suffered more acutely than in other periods of history. Due to necessity during the pandemic, Mr. Wilder was subjected to numerous facility lockdowns and a complete cessation of visitors for large portions of his imprisonment. While frightening and anxiety-provoking, Mr. Wilder has always maintained with us a steely resolve and determination to remain upbeat. He has participated actively in his case, been at all times respectful and appreciative and has been a pleasure to represent. His good cheer is even more admirable given the challenging circumstances that he and others have faced during this period.

### F. Punishment, Deterrence, and Protection of the Public

The principals of punishment, deterrence, and protection of the public will be satisfied by a sentence within the Guidelines Range with an allowance to permit Mr. Wilder to serve the remainder of his sentence under home confinement to care for his son. At fifty-seven years old, Mr. Wilder is an older gentleman with severe health conditions. He is a loving and doting father who is committed to bettering and providing support for his community and family. While Mr. Wilder does have a criminal history and his recent misconduct is cause for concern, Mr. Wilder is determined to turn over a new leaf. He appreciates that he has no choice, if he is to provide for his son, W█████. Here, Mr. Wilder's interest dovetails with that of the community and public in ensuring that W█████ have Mr. Wilder actively involved in his life and providing full time care.

Mr. Wilder also has different avenues of employment available. In their letters, Dawn Tartt and Elizabeth Brabham offer Mr. Wilder positions at their respective organizations. Ex. D, Ltrs. 7 & 1, respectively. Ms. Tartt owns a cleaning service and has offered Mr. Wilder a position at her business and a play to stay. and Ms. Brabham works at a non-profit that provides "furnish[ed] meals, build[es] character, and uplift[s] spirits." In Bronx communities *Id.*, Ltr. 1. provides "furnish[ed] meals, build[es] character, and uplift[s] spirits" in Bronx communities *Id.*, Ltr. 1.

### Conclusion

Mr. Wilder will have served close to two full years of incarceration at the time of his sentencing. In those two years, Mr. Wilder has maintained an unblemished record of good behavior with no infractions and has committed himself to providing support as best he can to his younger children. A sentence of home incarceration will allow Mr. Wilder to be punished, but still care for his son with disabilities full time due to the severity of his son's ███████████████████████.

---

[8] *COVID Data Tracker*, Centers for Disease and Control, https://covid.cdc.gov/covid-data-tracker/#county-view?list_select_state=New+York&data-type=CommunityLevels&null=CommunityLevels.
[9] "A 'Tripledemic'? Flu and Other Infections Return as Covid Cases Rise," *New York Times*, https://www.nytimes.com/2022/10/23/health/flu-covid-risk.html.

The Honorable Gregory H. Woods
November 15, 2022

      Thank you for Your Honor's consideration of these issues.

                         Very truly yours,

                         Samidh Guha
                         Sophia G. Weinstock
                         Perry Guha LLP
                         1740 Broadway, 15th Floor
                         New York, NY 10019
                         Email: sguha@perryguha.com
                         Telephone: (212) 399-8330
                         Facsimile: (212) 399-8331

                         *Attorneys for Defendant Warren Michael Wilder*